IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

IFTIKHAR AHMED MEMON,

Plaintiff,

v.

WESTERN TECHNICAL COLLEGE,

Defendant.

OPINION & ORDER

14-cv-581-jdp

---

This is the fourth case plaintiff Iftikhar Ahmed Memon has recently filed in this court alleging discriminatory hiring practices by community and technical colleges in Wisconsin and Illinois. Plaintiff brings this action alleging that defendant Western Technical College (WTC) violated Title VII of the Civil Rights Act and the Age Discrimination in Employment Act (ADEA) by discriminating against him based on his race, sex, national origin, religion, and age when it refused to interview him for an associate dean position.

Each side has filed a summary judgment motion. After considering the parties' briefs and supporting evidence, I will grant defendant's motion for summary judgment, because plaintiff fails to present evidence from which a reasonable jury could find that defendant is lying when it explains that it made its decisions based on its stated qualifications rather than the applicants' race, sex, national origin, religion, or age.

PRELIMINARY MATTERS

Before turning to the merits of the parties' summary judgment motions, I will address two other motions by plaintiff. Plaintiff has filed a motion containing two requests for defendant to give him information, Dkt. 27, which I will construe as a motion to compel

discovery. Plaintiff first asks for a list of jobs at WTC for which he has applied, going back to 2003. Defendant responds that plaintiff never filed a formal discovery request regarding these records; plaintiff emailed WTC staff for this information before he filed this lawsuit. This would be reason enough to deny plaintiff's motion to compel this information. But defendant did respond to plaintiff's request by stating that plaintiff's name did not appear on any applications going back to 2008, and that it did not have records of applications before then. This is a sufficient response. Plaintiff cannot compel discovery of information that defendant no longer has, and plaintiff does not raise any plausible reason to doubt the truth of defendant's response.

Second, plaintiff asks for updated diversity statistics for faculty and administrators at WTC. Plaintiff first received this information from the director of human resources before the lawsuit was filed. This information was part of a document titled "Western Technical College, Equal Opportunity Plan, 2005-2010." Dkt. 1-2, at 24. Plaintiff then sent requests for admissions asking defendant to admit that it had zero teachers or administrators of various racial and ethnic groups.[1] Defendant responded by answering plaintiff's questions regarding two sets of dates: February 18, 2014 (the day before plaintiff applied for the associate dean position) and May 15, 2015 (the time of the requests for admission), with simple "admit" or "deny" answers, but not indicating how many employees of particular demographic groups were working for WTC for the requests for which they denied that there were zero employees.

---

[1] For example, plaintiff asked whether "[t]he data shows that WTC has zero (0) Full Time Asian male[s] in Exec/Adm Mgr." Dkt. 14, at 3.

2

Plaintiff noticed that the answers to his requests for admission were different than the data in the "Equal Opportunity Plan" document (presumably because the timeframes are different), and states that he "do[es] not understand . . . why [the human resources director] provided [him] expired public information." Dkt. 27, at 3. The obvious answer to this is that the human resources director gave plaintiff the information that was available at the time (a time before the lawsuit was even filed), and defendant answered plaintiff's formal requests for admission with evidence that was available at that later time.

Plaintiff sought more data. Upon receiving the responses to his request for admission, plaintiff sent defendant's counsel a letter stating, "Under the Wisconsin Open Records Law, § 19.31 et seq., I am requesting an opportunity to inspect diversity data of full time teachers and diversity data of full time Exec/Adm Mgr" at WTC. Dkt. 44-1, at 1. Defendant states that counsel responded by explaining the differences in the "Equal Opportunity Plan" document and the admission responses, and stating, "I am not the custodian for a public record for WTC so if you want to follow up and make a public record request, I first of all would suggest that you specify the time frame and that you contact WTC directly." Dkt. 39, at 4. Plaintiff did not follow up.

Plaintiff seems to have gotten confused between open records requests and the various types of discovery requests available to him in this case. Plaintiff did not call his letter a request for production of documents or follow up with defendant after counsel's response, so it is understandable that defendant did not respond to the letter as a formal request for production of documents. I will deny plaintiff's motion to compel the production of new data, but I note that he is not prejudiced because he did receive contemporary data from defendant in its responses to his requests for admission, albeit somewhat ambiguous

responses in the form of denials that there were zero employees of various racial or ethnic groups. As discussed further below, this statistical evidence is of only very limited value to plaintiff, even granting him some inferences given the ambiguity of the defendant's responses.

Defendant moves for reasonable expenses incurred in opposing plaintiff's motion to compel under Federal Rule of Civil Procedure 37(a)(5)(B). I will grant defendant's motion, and direct defendant to submit an itemized accounting of its reasonable expenses. I stress the word "reasonable"—plaintiff's motion should not have been a difficult one to oppose, so any request for anything more than a minor amount should be explained in detail. Plaintiff will be given a chance to object.

Plaintiff has also filed a motion for the court's assistance in recruiting counsel, Dkt. 27, but he does not support his motion with evidence that he has attempted to locate counsel on his own and has been rejected, as is usually required by this court. Nor am I convinced that this matter is too complicated for plaintiff to litigate. As I stated in plaintiff's previous case, "based on his efforts in litigating this and other lawsuits, it seems clear that plaintiff's problem is not that he lacks a trained advocate. He is capable of presenting his case, but he has no evidence to support his belief that he has faced unlawful discrimination." *Memon v. Chippewa Valley Tech. Coll.*, No. 14-cv-243-jdp, 2015 WL 5009954, at *1 (W.D. Wis. Aug. 20, 2015). I will deny plaintiff's motion for recruitment of counsel and decide the parties' summary judgment motions on their merits.

## UNDISPUTED FACTS

Plaintiff Iftikhar Ahmed Memon is a resident of Black River Falls, Wisconsin. Plaintiff is a man of Pakistani descent, practices Islam, and was born in 1968. He identifies as Asian.

Defendant Western Technical College, located in La Crosse, Wisconsin, is a part of the Wisconsin Technical College System. It is a post-secondary technical college that offers training and short-term certifications to students and awards two-year associate degrees and one- and two-year technical diplomas.

On February 13, 2014, defendant posted an open position for "Associate Dean-General Studies." Defendant describes the associate dean as an employee who "assists the Dean in advancing the academic vision and leadership required to achieve high standards of excellence and continuous quality improvement in instruction and services with measureable outcomes for faculty, staff, and students." Dkt. 45, at 3, ¶ 8.

The job posting listed the following required and preferred qualifications:

> (1) Master's Degree required (preferably in one of the departmental areas within General Studies).
>
> (2) Minimum of two years' full-time teaching experience (or eight semesters part-time teaching) required plus.
>
> (3) Minimum of four years' occupational experience (supervisory experience preferred) plus at least one year (2,000 hours) nonteaching occupational experience if degree is in a General Education field or two years (4,000 hours) directly related occupational experience if degree is outside General Education.
>
> (4) Preferred candidates will have some additional training in higher education leadership.

*Id*. at 4, ¶ 9.

Applicants were not asked to supply information about their age, color, or religion, but they could choose to self-identify their race or gender. Such self-identification information was held confidentially by the human resources department and was not

accessed by any staff member involved in choosing whom to interview or hire. Plaintiff self-identified as an Asian man in his application.

Defendant received 47 applications. Defendant determined that 44 applicants, including plaintiff, were at least minimally qualified. Defendant assembled a "selection team" of seven WTC employees to review the 44 applications and determine which applicants were most qualified and would be granted an interview. At least six of the seven selection team members were white; defendant does not provide the race of the seventh member. The team rated each candidate's application materials in six categories: "Education/Training (any higher education leadership); Years of Teaching Experience; Years of Management/Administrative Experience (supervisory experience preferred); Quality of Resume/Vitae; Quality of Cover Letter and Experience in Strategic/Academic planning processes." *Id.*, at 8-9, ¶ 20. The team graded each applicant on a 1-to-5 scale in each category.

Plaintiff holds master's degrees in education and agricultural economics. Plaintiff's employment background in the education field included a position at the Ho-Chunk Youth and Learning Center, where he taught and tutored Native American middle- and high-school children. He held this position from 2008 to the time he applied for the job with WTC. Plaintiff had also served as director of the St. Peter's English Learning Center in Sindh, Pakistan, teaching English as a foreign language. Plaintiff worked in this position from 1986 to 1996, for 15 hours a week. Plaintiff also worked as a lecturer at Sindh Agricultural University Tando Jam in Pakistan from 1994 to 1996.[2]

---

[2] Plaintiff asserts that he was a lecturer from 1995 to 1999, but his resume shows the 1994-96 dates, Dkt. 23-11, at 27.

Plaintiff's resume included supervisory experience as assistant manager at a Speedway Super America Gas Station in Eagan, Minnesota, from May 2003 to May 2004. As "night manager" he supervised an average of four to five employees. Plaintiff also supervised an average of seven employees in his position at St. Peter's English Learning Center.

Defendant states that the selection team considered plaintiff's application materials and concluded that plaintiff's supervisory experience was "weak or non-existent." Dkt. 45, at 13, ¶ 28. Plaintiff did not have the preferred qualification of additional training in higher education leadership. Selection teams members described plaintiff's cover letter and resume as "inferior as to quality, contain[ing] typographical errors, and not directed to the position for which he as applying." *Id*. at 14, ¶ 29.

After reviewing the candidates' application materials, the selection team reached a consensus that four candidates were most qualified: Carrie Ann Brühlmann, Robert Leifeld, Mark Carlson, and Mary Anna Thornton.

Brühlmann, a white woman, met the preferred supervisory experience qualification and was working on a doctorate in business administration to be completed in 2015. In her most recent job, as "Deputy/Assistant to the Academic Dean" at the Hotel and Tourism Management Institute, in Sörenberg, Switzerland, Brühlmann prepared students for management careers in global hospitality and she had done that for about three years. She supervised 25 faculty and staff and had teaching experience in business and English. A selection team member stated that "her cover letter highlighted her accomplishments, focused on quality and mentioned being student centered." Dkt. 45, at 25, ¶ 35.

Leifeld, a white man, was working as a dean at a technical college and had worked in similar positions for six years. He held a master's degree in education and was working on a

7

doctorate in higher education to be completed in 2014.[3] He met the preferred higher education leadership and supervisory experience qualifications.

Carlson, a white man born in 1960, taught at the high-school level for 10 years and had been a principal or associate principal since 1996, supervising 45 to 60 employees. This met the supervisory qualification. He had a master's degree in secondary administration and a "director of instruction" certificate. Carlson's resume included his involvement in various activities with Lutheran churches.

Thornton, a white woman born in 1961, worked as the "assistant head of school" at Conserve School, a high-school-level "semester school" focusing on environmental stewardship. She had held this or similar positions in K-12 settings for about 19 years, supervising 30 to 35 employees, which met the supervisory qualification. She also worked as a four-hour-a-week instructor at UW-Stevens Point, teaching a "hybrid graduate course in curriculum and instruction." Dkt. 21-3, at 1-2. She held a doctorate in anthropology and a master's degree in educational technology.

Brühlmann, Leifeld, Carlson, and Thornton were each interviewed by the selection team, which ultimately recommended Thornton for the position.

Plaintiff did not meet in person with any member of the selection team while his application was being considered. After the selection process concluded, plaintiff sought feedback about why he was not selected. WTC Human Resources Director John Heath (who was not on the selection team) and Doug Strauss (who was on the team) responded to plaintiff by email. Sometime in 2014, plaintiff met with Strauss in person and asked why he

---

[3] Defendant states that Leifeld had completed his doctorate at the time of his application, but this is incorrect, as indicated in his resume. Dkt. 21-2, at 12.

did not give him an interview. Strauss told him "we cannot" and that there were 40 qualified candidates. Sometime in either June or August 2014, plaintiff met with John Heath, who printed out diversity information for administrators and faculty at WTC.

ANALYSIS

## A.  Standard of review

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, plaintiff "must set forth specific facts showing that there is a genuine issue for trial." *Id.* He may not simply rely on the allegations in his pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [his] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996) (citations omitted).

## B.  Title VII

Plaintiff brings discrimination claims under Title VII, which makes it unlawful for an employer to fail or refuse to hire an individual because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Plaintiff's claims focus on the selection of candidates to interview for the position. *See Shipley v. Dugan*, 874 F. Supp. 933, 937 (S.D. Ind. 1995) ("Title VII . . . [is] offended by discrimination at any point in the selection process.").

9

A plaintiff can prove discrimination under Title VII by using either the "direct" or the "indirect" methods of proof. *Darchak v. Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). In any employment discrimination case, the central question is "whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540 (7th Cir. 2005) (quotation marks and citation omitted). In a previous order addressing defendant's motion to dismiss, I noted, "Defendant assumes, and plaintiff does not dispute, that plaintiff's claims rely on the 'indirect method' of proving discrimination." Dkt. 12, at 2. At the summary judgment stage, plaintiff does not provide any more explanation of whether he is attempting claims under both methods, but I will address both, starting with the indirect method.

## 1.  Indirect method

Under the indirect method of proving discrimination, plaintiff must establish a *prima facie* case consisting of four elements: (1) he was a member of a protected class; (2) he applied for an open position for which he was qualified; (3) he did not receive the position; and (4) those who were hired were not in the protected class and had similar or lesser qualifications. *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Satisfying all four prongs of the *prima facie* case shifts the burden to the defendant "to produce a legitimate, noninvidious reason for its actions." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). If the defendant rebuts the *prima facie* case, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id*.

10

Plaintiff meets the second and third elements for a *prima facie* case because it is undisputed that he was at least minimally qualified, and that he was not hired for the position. Plaintiff also meets the first element from an objective standpoint: it is undisputed that he is Asian, of Pakistani origin, Muslim, and a man. At least with regard to his claims based on race, national origin, and religion,[4] defendant argues that plaintiff fails to show that members of the selection team were even aware that he was a member of a protected class; they would have had to speculate about his race, national origin, and religion based on the information in his application materials.[5] But it is possible that the members could make an educated guess about an applicant's race, national origin, or religion from biographical data on his or her application, so I will not grant summary judgment to defendant based on this ground.

This leaves the question whether plaintiff had qualifications similar to or greater than the applicants who were interviewed. This issue is closely tied to the question whether defendant's proffered reason for not interviewing plaintiff is a pretext to cover defendant's true discriminatory purpose. "[T]o show pretext, a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.'" *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)).

---

[4] Defendant does not argue that the selection team was unaware of plaintiff's sex.

[5] Similarly, although not explicitly raised by defendant, there is no evidence indicating that the selection team *knew* that the four candidates chosen for interviews were outside plaintiff's protected classes. But it is possible that they could surmise that from the applicants' materials.

Because the fourth element of plaintiff's *prima facie* case and the question of pretext are so closely related, I will consider them together. As I have explained to plaintiff in his previous cases, Title VII plaintiffs face a high bar in showing the falsity of an employers' rationale that one applicant is more qualified than another. "[E]vidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (internal quotation marks omitted). "This makes sense because a court's role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments." *Id*. at 1181 (internal quotation marks omitted).

Defendant contends that plaintiff was not interviewed because he "did not meet or was weak in the preferred qualifications in the supervisory and higher learning education leadership, and because he was generally weaker in other categories assessed." Dkt. 24, at 4. Members of the selection team filled out evaluation forms, in which they graded each applicant on a 1-to-5 scale on six categories having to do with the applicants' credentials and application materials. Plaintiff received relatively high scores (ranging from 3 to 5) in "Years of Teaching Experience," but received low scores in the other categories. Dkt. 23-11, at 31-36. However, his scores were the lower than each of the four candidates interviewed in each of the five other categories. *See* Dkt. 21 (the four interviewed candidates' application materials). Defendant particularly notes the categories covering the preferred qualifications, "Education/Training (any higher education leadership)" and "Years of

Management/Administrative Experience (supervisory experience preferred)." Plaintiff's scores in these categories ranged from "N/A" to 3.[6] Dkt. 21 and 23-11.

The main focus of plaintiff's claim that the selection team's choices were pretextual is that Carlson and Thornton (who was ultimately hired), had equally weak preferred qualifications to plaintiff, yet received interviews anyway. Plaintiff concedes that he did not meet the preferred qualification of training in higher education leadership. But he argues that neither Carlson nor Thornton did either. I cannot say as a matter of law that defendant is correct about its assessments of this qualification.

Defendant states that Carlson met that qualification "because of his Director of Instruction certification," Dkt. 46, at 5. On its face, the term "higher education leadership" would seem to mean leadership in a college setting. Neither party explains what Carlson's "Director of Instruction certification" certification is, but my own research indicates that it is a license regarding school-district-level administrators, not college-level administrators. *See* dpi.wi.gov/sites/default/files/imce/tepdl/download/lpg_adm_10_2010.doc (last visited March 19, 2016) ("The Director of Instruction (10) license is required for a person to serve as a supervisor, coordinator or director of curriculum, instruction or staff development in a school district.").

Defendant says that Thornton's qualification comes from her "work experience in curricula design, assessment methods, professional learning communication, faculty evaluation and course scheduling," Dkt. 46, at 5, but does not explain what this means. It seems to be based on her work as a four-hour-a-week instructor at UW-Stevens Point

---

[6] The only reasonable inference from a "not applicable" score in this context is that it is equivalent to a zero rating, but even if I excluded those scores, plaintiff rated lower than the four candidates interviewed in every category but "Years of Teaching Experience."

teaching a "hybrid graduate course in curriculum and instruction." Plaintiff reasonably argues that work as a college-level instructor is not the same as training in college-level leadership, or alternately, that working on curriculum design and the like is no different to the work he did as a college-level instructor.

But even assuming that defendant erred in concluding that Carlson and Thornton met this preferred qualification while plaintiff did not, the error alone does not prove pretext. *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) ("Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter."). Taking this qualification aside, defendant had other reasons to conclude that plaintiff was not as qualified as Carlson and Thornton.

For instance, the selection team members considered plaintiff's supervisory experience to be "weak or non-existent." Dkt. 45, at 13, ¶ 28. Plaintiff's credentials in this category were that he worked as an assistant manager at a gas station for about a year, supervising an average of four to five employees; and that he worked as the director of St. Peter's English Learning Center in a part-time capacity for ten years, supervising an average of seven people. Plaintiff argues his qualification in this category is equal to Carlson or Thornton. But Carlson worked as a high school principal or associate principal for about 18 years, supervising 45 to 60 employees and Thornton was a full-time "assistant head of school" in K-12 environments for about 19 years, supervising 30 to 35 employees. Defendant was allowed to weight Carlson's and Thornton's supervisory experience as better than plaintiff's.

Plaintiff's focus on the preferred qualifications ignores other factors used by the selection team to deny plaintiff an interview. Plaintiff received no grades higher than a 3 on

the 1-to-5 scale in "Quality of Resume/Vitae," and "Quality of Cover Letter." The team graded his cover letter and resume low in part because of grammatical and typographical errors. For instance, the first paragraph of plaintiff's resume, under the "Objective" heading, plaintiff states, "Let's increasing the utilization of minorities, women, and the handicapped at all levels in all units . . . ." Dkt. 23-11, at 26. At least one of the selection team members thought plaintiff's cover letter was not "directed to the position he was applying for" because it did not address "his leadership/administrative background," "never mentioned the position he was seeking was in a technical or community college," and "it referred to fundraising and other aspects that did not apply to a technical or community position." Dkt. 26-3, at 4-5.

Plaintiff also received no grade higher than a 3 in "Experience in Strategic/Academic planning processes," scoring below each of the other candidates. Defendant thought each of the four candidates interviewed had more relevant experience. I have already discussed Carlson's work as a high school principal and associate principal and Thornton's work as an assistant head of school. Brühlmann's previous experience was as a full-time deputy academic dean, and Leifeld was working as a dean at a technical college.

Plaintiff also argues that defendant should not have taken into account that three of the four candidates selected for interviews either had a Ph.D. or were in the process of completing a doctorate. But it is not for this court to second-guess the factors used by defendant in evaluating the candidates. *Millbrook*, 280 F.3d at 1181. Although a doctorate was not explicitly required, defendant was free to consider advanced degrees in deciding who was best qualified.

Alternately, plaintiff argues that he too had done Ph.D.-level coursework, and cites to three 8000-level courses he had taken at the University of Minnesota. But unlike the other

15

candidates, he did not represent in his application materials that he was actively pursuing a doctorate, so there is no reason to fault defendant for failing to give him credit. Similarly, plaintiff argues that his master's degrees are more focused on technical subjects, making them more relevant than the other candidates' degrees, but it is generally up to the employer to weigh each individual's credentials. After considering all of the parties' arguments and the record, I conclude that plaintiff fails to show that he was so better qualified than the other applicants that there "can be no dispute among reasonable persons of impartial judgment" that plaintiff was "clearly better qualified" under *Millbrook*.

Other than the parties' qualifications, plaintiff's main piece of evidence is historical employment data, which he believes shows a longstanding pattern of discrimination against Asians.[7] He submits a summary of data from the document titled "Western Technical College, Equal Opportunity Plan, 2005-2010." Dkt. 1-2, at 24. It is unclear exactly whether this data refers to the state of hiring during the 2005-10 time period or before, but is shows that there were zero employees of a racial or ethnic minority group among the 56 "District Employees" in the "Exec/Adm Mgr" category, and one employee of a racial or ethnic minority group among the 202 district employees in the "Faculty" category. However, it also shows that only 336 of the 13,426 members of the "District Labor Force" (or about 2.5 percent) for the "Exec/Adm Mgr" group were members of a racial or ethnic minority group. Only 39 of the people in this labor force (about 0.29 percent) were in the "Other" category, which I assume includes Asian members of the workforce, as there is not a separate category for Asians. Fifty-seven of the 1,011 members of the "District Labor Force" for the "Faculty"

---

[7] Plaintiff does not provide analogous information to support his claim for discrimination based on national origin or religion.

category were members of a racial or ethnic minority group (about 5.6 percent). Thirty-six (about 3.6 percent) of these people were in the "Other" category.

Plaintiff received some updated statistics in response to his requests for admission. In particular, defendant admitted that there were zero full-time Native American, Asian, African American, or Hispanic employees in the "Exec/Adm Mgr" category at the time plaintiff submitted his application, February 2014. As of May 2015, defendant still had no "Exec/Adm Mgr" employees who were Native American, Asian, or African American, but at least one employee who was Hispanic (defendant denied that there were zero but did not specify how many Hispanic employees it had).

Defendant's responses to plaintiff's requests for admission about faculty were more ambiguous, as defendant denied having zero full-time Asian American male, Asian American female, African American male, African American female, Native American male, and Native American female faculty members (plaintiff did not ask about Hispanic faculty members). Again, defendant does not explain how many more employees than zero they had for each category. I will give plaintiff the benefit of the doubt with regard to any ambiguity in this data and assume that when defendant denies that there are zero employees of a certain racial group, it means that there is only one.

In two of plaintiff's previous cases, he has tried to prove discrimination through similar statistics, to no avail. *See Memon*, No. 14-cv-243-jdp, 2015 WL 5009954, at *7-8; *Memon v. Waukesha County Tech. Coll.*, No. 13-cv-704-jdp, 2015 WL 3651791, at *10 (W.D. Wis. June 11, 2015). Unlike his previous cases, there is at least some evidence in the record explaining the racial characteristics of the potential labor force for administrator and faculty

17

positions at WTC, so it is possible to compare defendant's hiring practices with the racial makeup of the potential applicant pool.

But usually, "[w]ithin the *McDonnell Douglas* individual disparate treatment model, . . . statistical evidence is only one small part of a substantial web of evidence indicating pretext." *Bell v. E.P.A.*, 232 F.3d 546, 553 (7th Cir. 2000). And the data here is not striking enough to be particularly helpful to plaintiff. Defendant's "Equal Opportunity Plan, 2005-2010" shows that there were relatively low percentages of racial and ethnic minorities in the labor force, particularly with regard to Asian candidates. At best, it shows that defendant hired administrators and faculty members at only slightly lower percentages than their presence in the labor force.

Plaintiff's evidence regarding his national origin or religion is even weaker because he presents no statistical evidence supporting those claims. His sex claim is the weakest of all because two of the four people interviewed were men. Given the more relevant evidence regarding plaintiff's inferior credentials for the job, no reasonable jury could conclude that defendant's decisions to interview candidates were based on the race of the candidates. Because plaintiff fails to provide evidence that could lead a reasonable jury to find that he was more qualified or that defendant's decisions were pretextual, plaintiff's attempt to prove discrimination under the indirect method fails.

### 2.   Direct method

Under the direct method, a plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). Direct evidence is something close to an explicit admission by the employer that a particular

decision was motivated by discrimination; this type of evidence is rare, but it "uniquely reveals" the employer's intent to discriminate. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). Plaintiff does not present any evidence of this nature.

More common is proof by circumstantial evidence, "which suggests discrimination albeit through a longer chain of inferences." *Hasan*, 552 F.3d at 527 (internal citation omitted). A plaintiff can support his claim by "constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Koszola v. Bd. of Educ. of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Evidence that proves a claim under the direct method typically includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action.

*Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014) (citation omitted). A plaintiff need not produce evidence in each category to survive summary judgment. *See Darchak*, 580 F.3d at 631.

The evidence submitted by the parties falls into the latter two categories. But that evidence does not create a "convincing mosaic" showing discrimination, for similar reasons to those discussed above regarding the indirect method. The evidence shows that plaintiff was minimally qualified for the position and that defendant chose to interview candidates it considered more qualified. The statistical data on which plaintiff focuses is, at best, very weak evidence that defendant hired minority candidates at a slightly lower rate than the labor

force. It does not come close to pointing *directly* to a discriminatory reason for the interview and hiring decisions, as required under the direct method.

Because plaintiff is unable to raise genuine issues of material fact under either the direct or indirect methods, I will grant defendant's motion for summary judgment on plaintiff's Title VII claim, and deny plaintiff's motion for summary judgment.

## C. Age discrimination

The ADEA prohibits employers from refusing to hire workers who are 40 or older on the basis of their age. 29 U.S.C. §§ 623(a)(1), 631(a). As with Title VII claims, a plaintiff suing under the ADEA may show discrimination directly or indirectly. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). Plaintiff does not present any evidence to support his ADEA claim other than that he is over 40 and he did not get the job. Plaintiff does not provide any argument or statistical evidence suggesting that defendant treated older applicants differently. Rather, it is undisputed that the applicant getting the job, Thornton, was older than plaintiff, as was at least one of the other interviewees, Carlson. Because plaintiff has failed to present any evidence creating a dispute of material fact on his ADEA claim, I will grant defendant's motion for summary judgment on that claim.

## ORDER

IT IS ORDERED that:

1.  Plaintiff Iftikhar Ahmed Memon's motion to compel discovery, Dkt. 27, is DENIED.

2.  Defendant's motion for reasonable expenses incurred in opposing plaintiff's motion to compel, Dkt. 39, is GRANTED. Defendant may have until April 8, 2016, to submit an itemized accounting of its reasonable expenses. Plaintiff may have until April 22, 2016, to file any objections.

3.  Plaintiff's motion for the court's assistance in recruiting him counsel, Dkt. 27, is DENIED.

4.  Defendant Western Technical College's motion for summary judgment, Dkt. 24, is GRANTED. Plaintiff's motion for summary judgment, Dkt. 23, is DENIED.

5.  The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered March 25, 2016.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

21